UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | 19-cr-10190-PBS |
| BRENO HENRIQUE DASILVA | |

**MEMORANDUM OF LAW**
**IN SUPPORT OF BRENO HENRIQUE DASILVA'S MOTION TO SUPPRESS**

Law enforcement personnel, based on all of their training and expertise, initially sought two warrants in this case: an arrest warrant and a search warrant. On April 25, 2019, when they arrived at 82 Partridge Street to execute the warrants, they chose to rely on the arrest warrant and effectively disavow the search warrant. Law enforcement elected to wait hours until the defendant emerged from the home. They chose to arrest Mr. DaSilva and coerce him, a handcuffed non-English speaker, into leading them on a tour of his home and allowing them to search it. Because the Government disavowed the search warrant, the search of 82 Partridge Street became a warrantless search. Based on the warrantless search of Mr. DaSilva's residence, and resulting seizure of the white iPhone, was conducted without other legal justification, the Court should suppress the evidence seized.  This request is novel but supported by intuition, logic, and basic fairness. If the government wished to utilize a belt-and-suspenders approach, then they needed to wear both. They did not.

## STATEMENT OF FACTS[1]

According to the Report of Investigation by the Bureau of Alcohol, Tobacco, Firearms, and Explosives, hereinafter referred to as the ATF, magistrate judge M. Page Kelley issued a federal arrest warrant for Breno Henrique DaSilva. (Paragraph 1). Based on that warrant and reliable information that Mr. DaSilva was present at that location on April 25, 2019, state and federal agents arrived at 82 Partridge Street, Somerville, Massachusetts at approximately 4:50 a.m. on April 25. Federal agents observed two people exit the residence separately and leave in different vehicles. (Paragraph 2).  At approximately 7:35 a.m. the agents observed a truck arrive and noted that it "appeared to be waiting for someone as nobody got out." (Paragraph 3). A few minutes later, agents watched Mr. DaSilva exit the basement and walked toward the front of the residence. (Paragraph 4). Agents in multiple vehicles approached Mr. DaSilva, "identified themselves as police, and commanded him to show his hands," to which Mr. DaSilva immediately complied. (Paragraph 5).  Agents then handcuffed Mr. DaSilva and searched his person; that search yielded an LG phone and a wallet. (Paragraphs 5-6). Agents also searched the backpack Mr. DaSilva was wearing, and that search yielded his Brazilian passport. Agents seized his passport and LG phone, but zipped his wallet and other personal property inside the backpack. (Paragraph 6).

---

[1]  The facts recited in this memorandum are drawn from the allegations in the ATF Report of Investigation and attachments (Exhibit One; Bates #128 through #135), the Search and Seizure Warrant with Return (Exhibit Two; Bates #997 and #998), as well as the Affidavit in Support of a Search and Seizure Warrant (Exhibit Three; Bates #954-986). The following exhibits are attached: The Report and attachments, Exhibit One; Affidavit In Support of a Search and Seizure Warrant, Exhibit Two; the Search Warrant Return, Exhibit Three; Application for a Search and Seizure warrant (Bates #987-996), Exhibit Four; Search and Seizure Warrant (Bates #943-953), Exhibit Five. Recitation of the facts herein should not be taken as an adoption thereof by Mr. DaSilva.

At this point, Mr. DaSilva informed the police that he did not speak English. Agents asserted that they "were able to communicate with him in limited Spanish.[2]" The agents advised him that they had an arrest warrant for him and that he would be transported to court. Mr. DaSilva told Special Agent Scott that he resided in the basement with a friend, and that he didn't have a room in the basement but merely slept on the couch. Special Agent Scott told Mr. DaSilva "he would be returning his backpack to his room and would also like to search his room." According to the Agents, Mr. DaSilva "said that as long as he came with the Agents they could search his area." (Paragraph 7).

Five different law enforcement officers together escorted Mr. DaSilva to the basement apartment "where his backpack was placed in the kitchen." Mr. DaSilva pointed to the area where he slept and kept his belongings. Agent Scott saw a white iPhone on the mattress, plugged into a charger, and seized it, checking "to see if it was secured by a passcode." Mr. DaSilva "stated that the phone was an old phone that didn't work any longer [and] showed Special Agent Scott that the phone wouldn't work as he said there was no way to unlock it because the screen was damaged." Mr. DaSilva attempted to unlock the phone via fingerprint but the phone did not respond. The phone "was seized as evidence item 005." Agents continued to search the area, including the area around his mattress, and above the tiles in the basement drop ceiling. When no contraband was found, the Agents concluded the search of the basement

---

[2]  Mr. DaSilva's first language is Portuguese. Agents were on notice of this fact prior to arriving at 82 Partridge Street, as they allegedly had audio of him speaking in Portuguese.

apartment. (Paragraph 8). Special Agent Peter Milligan attested that "no evidence taken" on the search warrant inventory, and returned it the same day (April 25th, 2019) to the magistrate judge. (Search and Seizure Warrant for 82 Partridge Street, Page 2; Bates #998). Neither the arrest warrant return nor the search warrant return have been filed in this case.

## ARGUMENT

In the early hours of April 25, 2019, law enforcement personnel arrived at 82 Partridge Street, Somerville, Massachusetts, with an arrest warrant for Mr. DaSilva and a search and seizure warrant for the basement apartment. Rather than executing the search and seizure warrant to retrieve contraband, law enforcement waited hours for Mr. DaSilva to emerge from the basement, at which point they arrested him and had him personally escort them into the basement so they could search it.

By their statements to Mr. DaSilva outside the residence, their report summarizing the events, and the sworn warrant return, law enforcement personnel relied on only the arrest warrant to grant authority to search the basement. Law enforcement forwent the search warrant, and thus it will not suffice to justify the search after the fact. Analysis of the validity of the search from only the arrest warrant and the events of that day renders the search warrantless and unreasonable. The consent exception to the warrant requirement of the Fourth Amendment does not justify the search, nor does the search incident to arrest exception. The protective sweep exception to the warrant requirement is also inapplicable here.

4

Because the warrantless search of the basement apartment is unjustified by any Fourth Amendment law, the exclusionary rule is an appropriate remedy to consider. The exclusionary rule should apply here because of the seriousness of the Fourth Amendment violation and the knowledge chargeable to law enforcement of the unconstitutionality of their conduct.

I.   THE SEARCH OF THE BASEMENT APARTMENT WAS UNJUSTIFIED WHERE IT EXCEEDED THE SCOPE OF AUTHORITY GRANTED BY THE ARREST WARRANT AND THUS VIOLATED THE DEFENDANT'S CONSTITUTIONAL RIGHTS AS A WARRANTLESS SEARCH

The Fourth Amendment to the United States Constitution protects the people from unreasonable searches by the government; specifically, it guarantees that "the right of the people to be secure in their…houses….against unreasonable searches…shall not be violated." U.S. Const. amend. IV. When police possess a valid arrest warrant, they possess the authority only to enter a residence for the purpose of executing the warrant, as opposed to the authority to search the residence. See *Payton v. New York*, 445 U.S. 573, 603 (1980) ("an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives where there is reason to believe the suspect is within"). A warrantless search of a private residence is "presumptively unreasonable" unless it conforms with one of the narrow exceptions. *United States v. Romain*, 393 F.3d 63, 68 (1st Cir. 2004).

At the time Agents entered the basement apartment at 82 Partridge Street, they had already placed Mr. DaSilva under arrest outside and handcuffed him pursuant to

the arrest warrant. They had also advised him that they possessed the arrest warrant and that he would be transported to court. Based on the representations of the law enforcement officers both in the report as well as to Mr. DaSilva at the scene, the search conducted by law enforcement was pursuant to the authority granted by the arrest warrant and not the search warrant. The arrest warrant did not grant them the authority to search the premises, possible exceptions to the Fourth Amendment's warrant requirement (the search incident to arrest exception, the protective sweep exception, and the consent exception) fail to render the search lawful, and defects in the search warrant return in violation of Rule 41(d) of Federal Criminal Procedure manifest an intention by law enforcement to disavow the search warrant as a basis for the search and proceed only under the authority granted by the arrest warrant.

### A.   THE SEARCH WAS NOT JUSTIFIED BY THE SEARCH WARRANT

The Federal Rules of Criminal Procedure require an officer executing the warrant to prepare an inventory of any property seized during the execution of the warrant. Fed. R. Crim. P. 41(f)(1)(B). The search warrant with the inventory must be "promptly" returned to the issuing judge. Fed. R. Crim. P. 41(f)(1)(D). These procedural requirements may be ministerial in nature, but a violation of these procedures could still warrant suppression. *United States v. Hall*, 505 F.2d 961, 963-64 (3d Cir. 1974). Congress must have intended for "some remedy to flow" from violations of the rule. *Id.* at 964. Suppression is the appropriate remedy where the defendant makes a sufficient showing of "prejudice in the sense that it offends concepts of fundamental fairness or due process." *Id.* Courts look to the purpose and goals of the rules: "'simplicity in

procedure, fairness in administration and the elimination of unjustifiable expense and delay.'" *Id.* at 963.  Congress intended for the rules to "ensure a just determination of every criminal proceeding." *Id.*

In *Hall*, the ATF received a valid search warrant for the defendant's residence on July 20, 1973, and executed it three days later. *Hall* 505 F.2d at 962. That same day, one of the agents who executed the search, signed a copy of the return, and gave the copy to the defendant. *Id.* The original return was never signed, and it was not filed until January of the following year, nearly five months after it was executed. *Id.* Because the defendant received a copy the same day, the court ruled that there was not a sufficient showing of prejudice and suppression was not warranted. *Id.*

In *Cady v. Dombrowski*, the police impounded and searched a vehicle pursuant to a valid search warrant. *Cady v. Dombrowski*, 413 U.S. 433, 438 (1973). They seized the front and rear seats, a sock, a piece of a rear floor mat, a briefcase, and a front floor mat. *Id.* The search warrant return only failed to mention two of those items: the sock and the front floor mat. *Id.* The court recognized this failure as a defect in the return, but held that it "need not reach the question of whether the seizure of the two items would have been valid because the entire car had been validly seized as evidence and impounded pursuant to a valid warrant." *Id.* at 449–50.

In *U.S. v Dauphinee*, the First Circuit considered whether suppression was an appropriate remedy for an inaccurate statement on a warrant return. *United States v. Dauphinee*, 538 F.2d 1,2-3 (1st Cir. 1976). The search in Dauphinee was conducted pursuant to the search warrant, which referred solely to "a quantity of hand grenades."

*Id.* The sworn return of that warrant stated "No property taken pursuant to warrant," as the police seized a revolver rather than any hand grenades. *Id.* The court held that "the district court did not err in denying the motion to suppress insofar as it was based on the wording of the return." *Id.* at 3.

This case is distinguishable from all of the foregoing. In *Hall*, the defendant received an accurate return, and the failure on the part of the ATF was in failing to make a timely return. In *Cady*, the return listed all but two of the items seized, and the court never reached the question of improper seizure of those items. *Dauphinee* considered only whether an incorrect warrant return could be the sole basis for suppressing evidence. In this case, the defendant indeed has received a return in discovery, however, it is inconsistent with the ATF's own incident report. Further, the return has still not been filed, over 10 months after the search warrant was returned. Specifically, the agents seized Mr. DaSilva's passport, LG smartphone, and an iPhone-- but the warrant return states "No Evidence Taken." The warrant return for 82 Partridge Street is not minorly incomplete in its list of items seized because it lists nothing as being seized. The search warrant in this case is broad in scope, unlike the one in *Dauphinee*, and smartphones like the iPhone seized fall squarely within its parameters (Search and Seizure Warrant for 82 Partridge Street, basement, Somerville, Massachusetts, Attachment B, page 29, Bates #951). Special Agent Milligan stated that "no evidence was taken" rather than "no evidence was taken pursuant to the warrant." More importantly, the search in *Dauphinee* was conducted pursuant to the search warrant and the only grounds for suppression were the incorrect return. The search in

Mr. DaSilva's case ostensibly occurred pursuant to the arrest warrant, however, law enforcement personnel never refer to the search warrant in their report, nor did they mention it to Mr. DaSilva.  As discussed in sections B through D below, the search and seizure of the basement at 82 Partridge Street pursuant to the arrest warrant was not a valid search and seizure. Thus, at least the iPhone cannot be considered seized pursuant to a lawful search of the apartment.

The government may argue that the failure to list the items seized on the warrant is a minor defect and ministerial in nature. The Court should reject such an argument because the sworn inventory claiming that "no evidence was taken" reflects a choice to disavow the use of the search warrant. Yet even if the Court finds the inventory to be a minor defect, the Court should still impose a remedy for that failure to follow the explicit strictures of Rule 41. The government's failure to list any items seized on the return, despite having seized multiple items, should negate its reliance on the search warrant. The defendant asks that the Court remedy the government's invalid return by allowing the government to proceed on the theory that the search and seizure were valid pursuant to the arrest warrant. That remedy is consistent with the representations made by the warrant return itself and the report prepared by the ATF.

### B.  THE SEARCH WAS NOT JUSTIFIED BY THE CONSENT EXCEPTION TO THE FOURTH AMENDMENT

Consent is an exception to the general rule that warrantless searches are per-se unreasonable under the Fourth Amendment. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). A consent search meets constitutional muster when the consent

is "unambiguous and...freely and voluntarily given." United States District Court, D. Puerto Rico. December 5, 2019--- F.Supp.3d ---, see also *Georgia v. Randolph*, 547 U.S. 103, 106 (2006).  The Government bears the burden to prove that the consent was valid. *United States v. Mendenhall*, 446 U.S. 544,557 (1980), *Schneckloth*, 412 U.S. at 222, 93 S.Ct. 2041 (1973). The Court uses a totality of the circumstances analysis to determine the validity of the consent. *Id*, citing *United States v. Mendenhall*, 446 U.S. 544, 557 1980). Courts consider many factors; some of them pertinent to the "vulnerability of the consenting party," including "age, education, experience, intelligence, and knowledge of the right to withhold consent." *United States v. Barnett*, 989 F.2d 546, 555 (1st Cir. 1993). Other factors that inform the analysis include "whether the consenting party was advised of his or her constitutional rights" and the coercive circumstances or method surrounding the purported consent. *Id.*  Language barriers between the defendant and police are also an appropriate factor for consideration. *United States v. Isiofia*, 370 F.3d 226, 233 (2d Cir. 2004). Regarding consent searches, "'Courts indulge every reasonable presumption against waiver' of fundamental constitutional rights."  *Lebron-Laviena*, citing *United States v. Page*, 302 F.2d 81, 83–84 (9th Cir. 1962). Courts have found implied coercion when officers obtained the consent "under color of the badge." *Id.* Where the government claims consent was given while the defendant was under arrest, it has a greater burden to show a lack of coercion in fact. *Id.*

In the Lebron-Laviena case, the court considered the defendant's age, education, understanding of the search as it happened, written consent, and the level of custody at the time he gave consent. The court found that Mr. Lebron Laviena was 34, with a high

school education, understood the representations made by officers themselves and relayed to him through his family, signed a consent form, and was not in custody when he gave consent--he was arrested after the consent was given. The court ruled that his consent was valid and the search was not unconstitutional.

This case is diametrically opposed to *Lebron-Laviena*. Mr. DaSilva was 20 years old on April 25, 2019, when the search of 82 Partridge Street occurred. Mr. DaSilva does not even have a high school education, nor did he speak English. Mr. DaSilva did not sign a consent form. There is no indication that he was ever presented with one in any language. There is also no indication that he was ever informed of his right to withhold consent, nor was he informed that the officers possessed a search warrant. Most importantly, Mr. DaSilva was in custody and had been placed under arrest at the time the officers sought his consent to search.

A key factor invalidating the alleged consent in the *Isiofia* case was the defendant's "difficulty in speaking and understanding English." In *Isiofia*, the police asked the defendant for his name and did not understand his heavily-accented response, so they searched his bag. Here, a different brand of 'failure to communicate' was manifest: Mr. DaSilva quickly informed the agents that he could not speak English. The agents had already seized his Brazilian passport; agents allege they had comprehensively investigated Mr. DaSilva, including capturing him on audio, speaking only Portuguese. Despite the known language barrier, agents still attempted to speak with Mr. DaSilva in two separate languages, neither of which were his native language.

11

Validity of consent to render a consent search constitutional is a totality of the circumstances analysis, and no single factor will be decisive. *Lebron-Laviena* at 3. However, each of the factors discussed above (age, education, understanding, written consent, language facility, and custody) all weigh against a finding of constitutionality. Additionally, the coercive nature of the encounter makes the government's burden of proof even more stringent. Law enforcement officers had approached him from two separate vehicles, immediately ordered him to put his hands up, and placed him under arrest. Mr. DaSilva was compliant with all of these orders. Officers then attempted to communicate with him in Spanish, not his native language, and informed him that they had an arrest warrant and would take him to court later. Only after Mr. DaSilva had been handcuffed and informed of the police's apparent authority did they attempt to get consent to search. Further, Special Agent Scott couched the inquiry in a coercive way: using the indicative mood, he announced that he was going to return Mr. DaSilva's backpack to inside the basement (where law enforcement had not yet been) and wanted to search the house. From Special Agent Scott's phrasing, it appears he had already concluded the search was going to occur. Mr. DaSilva's compliance with Special Agent Scott's orders is exactly the type of behavior that coercion is designed to elicit, and such coercion offends the Fourth Amendment.

While no single factor is conclusive in and of itself, the circumstances surrounding the alleged consent were undoubtedly coercive. Further, the thrust of six other factors is also against a finding of valid consent. Because Mr. DaSilva was in

custody at the time he allegedly consented to the search, the Government bears the
burden to establish consent and show that there was no coercion in fact. Based on the
overwhelming weight of the facts against a finding of voluntariness, the Court should
find that Mr. DaSilva did not give valid consent to the search to justify it under the
Fourth Amendment.

## C.  THE SEARCH WAS NOT JUSTIFIED BY THE SEARCH INCIDENT TO LAWFUL ARREST EXCEPTION TO THE FOURTH AMENDMENT WARRANT REQUIREMENT

A search incident to a lawful arrest may only include "the arrestee's person and
the area within his immediate control," from which the arrestee may produce a weapon
and endanger officer safety. *Arizona v. Gant*, 556 U.S. 332, 339 (2009), citing *Chimel v.
California*, 395 U.S. 752, 763 (1969). The prohibition of searches outside that area under
this exception is designed to vindicate the purposes of a search incident to arrest: to
protect officer safety and preserve evidence that may be easily 'concealed or destroyed.'
*Id.*

Law enforcement officers waited for Mr. DaSilva to exit 82 Partridge Street
before they approached him. When they saw him emerge from the home and walk
towards the front, they approached in two separate law enforcement vehicles and
commanded him to stop and put his hands up. Mr. DaSilva immediately complied.
There is no evidence to suggest that Mr. DaSilva was behaving erratically, that he was
moving furtively, or that he was concealing any objects within his grasp. Mr. DaSilva
did not pose a danger to the officers. They approached him, searched him, and

handcuffed him without incident. They searched his pockets and his backpack. The entire time they are arresting him and searching his person, everyone is outside.

The area within Mr. DaSilva's immediate control was the outdoors: there were no dressers, bookcases, boxes, nooks and crannies, or secret compartments from which he could have retrieved a weapon. A search of his pockets and backpack also failed to reveal a weapon or other dangerous implement. Thus, it was clear that, after he was handcuffed and told he was under arrest pursuant to an arrest warrant, Mr. DaSilva was not able to produce any weapons or endanger officer safety. Because he was in custody at this juncture, he was also unable to destroy any evidence. The purposes of the search incident to arrest exception had already been fully vindicated when officers searched the basement apartment. Therefore, that exception to the warrant requirement of the Fourth Amendment does not justify the search of the basement.

## D. THE SEARCH WAS NOT JUSTIFIED BY THE PROTECTIVE SWEEP EXCEPTION

Under the Fourth Amendment, warrantless searches are per se unreasonable; however, there are a few narrow exceptions to that rule, including a protective sweep as discussed in *Maryland v. Buie*. *United States v. Delgado-Perez*, 867 F.3d 244, 251 (1st Cir. 2017), citing *Maryland v. Buie*, 494 U.S. 325 (1990). In *Buie*, the Court tightly circumscribed the conditions under which this type of warrantless search is justifiable: it must be a brief glance around at the places where an assailant might be lying in wait, and must end as soon as the "reasonable suspicion of danger" is dispelled. *United States v. Paradis*, 351 F.3d 21, 29 (1st Cir. 2003), citing *Buie* at 335-36. Further, the Court

specified that a protective sweep "in any event [may last] no longer than it takes to complete the arrest and depart the premises." *Id*. The Court narrowed protective sweeps even further by requiring that an officer's reasonable belief of danger be based on "specific, articulable facts which, taken together with the inferences from those facts, reasonably" permitted the officer to believe that the area to be swept "harbored an individual posing a danger to officers or others." *United States v. Paradis*, 351 F.3d at 29, citing *Buie* at 327, *Crooker v. Metallo,* 5 F.3d 583, 584 (1st Cir.1993).

In this case, all of the law enforcement personnel involved had been surveilling the location hours before they saw Mr. DaSilva exit the residence. During that surveillance, they witnessed two distinct individuals leave the home and drive away, using different cars to do so. Shortly before Mr. DaSilva stepped outside, the officers watched as a truck bearing the logo of a construction company drove up and waited. The officers looked as Mr. DaSilva came outside, and allowed him to walk towards the front of the house before they identified themselves and ordered him to put his hands up. Mr. DaSilva was fully compliant with them and allowed them to handcuff him. Law enforcement personnel attempted to communicate with Mr. DaSilva in Spanish, advised him he was being arrested pursuant to an arrest warrant and would be taken to court later. Then Special Agent Scott asserted that he was going to go into the basement, out of which Mr. DaSilva had come earlier, to put Mr. DaSilva's backpack inside.

The facts show that law enforcement personnel had no articulable reason to believe anyone other than Mr. DaSilva was inside the house. Further, their own

behavior demonstrates a complete lack of concern that the basement to be searched was harboring dangerous confederates of Mr. DaSilva. More importantly, given that Mr. DaSilva was placed under arrest outside the home, there was no need to do a sweep of the basement for officer security. There are no specific and articulable facts cited by officers to support any argument that a protective sweep was justified. There was also no allegation that any member of law enforcement personnel possessed a suspicion, reasonable or not, that persons posing a threat to officers or others were lying in wait anywhere in the vicinity of the arrest. Without any articulable facts to support even a spectre of a suspicion of danger, the protective sweep exception does not apply here to absolve law enforcement of the harm done by the warrantless search.

## II. SUPPRESSION IS THE APPROPRIATE REMEDY FOR THE FOURTH AMENDMENT VIOLATIONS IN THIS CASE

The exclusionary rule is not an automatic consequence of a Fourth Amendment violation. *Herring v. United States*, 555 U.S. 135, 140 (2009), citing *Illinois v. Gates,* 462 U.S. 213, 223 1983). Courts apply the exclusionary rule to deter future Fourth Amendment violations. *Id.* at 140-41, internal citations omitted. The level of culpability of the law enforcement provides justification for using the exclusionary rule. *Id.* at 143. Assessing the flagrancy of the police conduct and whether the police knew or should have known that the search was unconstitutional is necessary in deciding to apply the exclusionary rule. *Id*, internal citations omitted. "The prophylaxis of the Fourth Amendment is at its zenith with respect to an individual's home." *United States v. Martins*, 413 F.3d 139, 146 (1st Cir.2005). Fourth Amendment case law is rife with the

sentiment that home is a constitutionally special space where strict requirements must be met if law enforcement is to enter. See *United States v. Romain,* 393 F.3d 63, 68 (1st Cir.2004), see also *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

Law enforcement officers had two valid warrants when they arrived at 82 Partridge Street on April 25, 2019. They chose to wait for Mr. DaSilva to come outside, where they handcuffed him, searched him, and informed him of the arrest warrant. After all of these demonstrations of authority, Special Agent Scott announced his desire to search the basement. This sequence of events represents a calculated strategy by officers; they chose to proceed with the arrest and search the basement pursuant to the authority granted in the arrest warrant. There was no need to inform Mr. DaSilva that they had an arrest warrant and that they would be taking him to court later. There was no need to arrest him outside—nor did the officers give any reasons such as "officer safety" for doing so. In fact, the search warrant granted them the opportunity to enter at any time, not solely during the daytime. Despite this, they waited until Mr. DaSilva was outside during the day to arrest him, rather than coming in while he was asleep to arrest him and search the basement. There was also no need for officers to seek his consent or discuss searching the basement with him prior to doing so. Rather than proceeding under the search warrant, and returning it in compliance with Rule 41 with an accurate inventory, law enforcement personnel chose to proceed under the arrest warrant. They should be bound by that choice.

Well-established case law makes it clear that the privacy of the home may only be violated in specific and narrow circumstances. When law enforcement officers

invade that privacy without a warrant, it is per se unreasonable. *United States v. Delgado-Perez*, 867 F.3d 244, 251 (1st Cir. 2017). The warrantless abuse of Mr. DaSilva's privacy in this case is a serious violation of the Fourth Amendment. Agents openly disregarded the search warrant and the mandated procedure for return of a warrant under Rule 41. They also flouted a serious language barrier by attempting to communicate with Mr. DaSilva in languages markedly different from his native language, of which they were on notice as they had seized his passport. They dismissed Mr. DaSilva's assertion that he did not speak English, and applied pressure to compel his alleged consent to search the basement apartment. It is reasonable to characterize this pattern of disregard by law enforcement personnel as flagrant.

Whether the law enforcement officers in fact knew that their conduct was violative of well-established Fourth Amendment law is for the Court to decide. However, they can and should be charged with that knowledge as far as their conduct evinces their awareness of the exceptions to the Fourth Amendment warrant requirement. Their statements in the report all refer to the arrest warrant, rather than the search warrant. They attempted to receive consent from Mr. DaSilva. They abided by the scope of that alleged consent by bringing a handcuffed Mr. DaSilva into the basement with them. Special Agent Scott wrote in the report that the iPhone was in "plain view." Special Agent Milligan alone has over a decade of experience at the ATF and two separate training credentials. (Affidavit of Special Agent Peter Milligan in Support of an Application for a Search Warrant for 82 Partridge Street, page 1, paragraph 1; Bates #954). All of these facts suggest that the law enforcement officers

had some level of knowledge of the Fourth Amendment case law pertinent to their conduct. Based on their own representations, they should have known that the search was unconstitutional.

Courts apply the exclusionary rule "only when it results in appreciable deterrence." *Herring*, 555 U.S. at 141. Using the exclusionary rule in this case would deter officers in the future from disregarding search warrants they sought themselves. It is a waste of time and resources to apply for a search warrant, receive it, and then never use it, instead conducting the search based on a patchwork of exceptions to the Fourth Amendment, or on a warrant granting much narrower authority. Applying the exclusionary rule here would also deter law enforcement from disregarding the specific mandates of the Federal Rules of Criminal Procedure. Binding the government to its choices and representations made in the warrant return is an appropriate remedy that vindicates the intent of the rules to ensure justice in every criminal proceeding. See *Hall*, 505 F.2d at 963.s

The government elected to proceed as if searching without a warrant.  In the nearly one year since this date of this search, they continue to rest on that incorrect legal theory.  The Fourth Amendment violation, combined with the knowledge police can reasonably be charged with that such conduct was unconstitutional, render this case apt for the remedy of the exclusionary rule. Suppression is appropriate in response to the violations of Mr. DaSilva's constitutional rights.

Respectfully submitted,
BRENO HENRIQUE DASILVA
By his attorney,

March 2, 2020

/s/ Leonard E. Milligan III

Leonard E. Milligan III
BBO 668836
Milligan Rona Duran & King LLC
50 Congress St. Suite 600
Boston, MA 02109
T.  617.395.9433
F.   617.395.5525