UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 1:19-cr-10190-PBS-4 |
| ) | |
| BRENO HENRIQUE DASILVA ) | |

## SENTENCING MEMORANDUM OF BRENO HENRIQUE DASILVA

Defendant Breno Henrique DaSilva ("Mr. DaSilva") respectfully submits the instant sentencing memorandum in support of his recommended sentence in the above-captioned matter.

### *Introduction*

Mr. DaSilva, an immigrant from Brazil with no prior record of convictions, was just twenty years-old when the instant offenses occurred. *See* Presentence Investigation Report ("PSR") ¶¶115-116. His conduct in this case, while serious and profoundly regrettable, was conspicuously marked by internal conflict and an enduring remorse that continues today. *See* PSR ¶¶37, 57, 138; *see also* Aid-to-Sentencing Evaluation by Carla Lourenco, Psy.D. ("Evaluation") attached at Ex. A at 4-6; and Curriculum Vitae of Dr. Lourenco "Lourenco CV") attached at Ex. B. The roots of Mr. DaSilva's fairly brief tenure in the PCM gang, as well as his often disillusioned time within it, are found in the many significant challenges he has faced in his young life.

When Mr. DaSilva was just two years-old, his father, a propane and beverage distributor in Brazil, was murdered. *See* PSR ¶117. As a result of his age at the time, Mr. DaSilva has no memory of his father. *See* Evaluation at 2. When Mr. DaSilva was approximately six years-old, his widowed mother fled Brazil for the United States without her children in search for a better life. *See* PSR ¶¶116. Mr. DaSilva and his older brother, Joan Marcos, were left behind to be raised by their grandparents and extended family. *See* PSR ¶¶116, 119. Virtually orphaned for much of his childhood, Mr. DaSilva was occasionally beaten by his uncle with reeds from local fruit plants; he was also bullied by peers for lacking both a mother and father. *See* PSR ¶116; Evaluation at 2,

1

5.  During this formative and challenging period, Mr. DaSilva formed a close bond with his brother, the only regular presence in his life. *See* Evaluation at 2, 5-6.

After an absence of approximately eight years, Mr. DaSilva's mother abruptly returned to Brazil in 2012-2013. *See* PSR ¶116. The family's financial situation was very poor, and Mr. DaSilva left high school to work like his family members to meet basic needs. *See* PSR ¶¶116, 134. While Mr. DaSilva obtained a high school equivalency certificate, the family was unable to find secure footing and soon again broke apart. *See* PSR ¶134.

Mr. DaSilva's entry into the United States with his mother when he was seventeen years-old can traced in part back to his father's murder. *See* Evaluation at 2. The man who murdered Mr. DaSilva's father had been released from prison, and upon his return to the same community, began making threats to kill Mr. DaSilva's family. *See* Evaluation at 2. Mr. DaSilva's brother relocated to a different community in Brazil in this period, working odd jobs to make ends meet. *See id*; PSR ¶119. Along with his mother, in July of 2016 Mr. DaSilva immigrated to the United States and was released by immigration officials on personal recognizance. *See* PSR ¶¶121, 123. The family was split once again.

Mr. DaSilva and his mother first settled in Weymouth, Massachusetts, and later moved to Stoughton and Quincy. *See* PSR ¶121; Evaluation at 2. After a time, Mr. DaSilva moved on his own to Somerville. *See id*. The teenager quickly set out to work for ordinary needs; he began with odd construction jobs, but found more consistent employment with Fernando Bie Autobody in Abington and Souza Landscaping in Weymouth. *See* PSR ¶¶136-137. In an interview with Probation, Carlos Reimildo DaMota, Mr. DaSilva's employer at Souza Landscaping, confirmed that Mr. DaSilva was a "hard worker, reliable, and very responsible" on the job. *See* PSR ¶136.

Without the dependable companionship of his older brother, however, life in the United States was challenging for the young Mr. DaSilva. *See* Evaluation at 2, 5-6. Separated by just a

2

year in age, the brothers had weathered the murder of their father, the near decade absence of their mother, and the everyday challenges of social and financial distress in Brazil.  *See id*.  Abruptly transplanted to a new country with a foreign language and culture, Mr. DaSilva slowly sought refuge in local peers who spoke his native Portuguese and could at least attempt to relate to his past in Brazil.  *See id*.  In 2018, Mr. DaSilva met several of the young men who either were or would become members of PCM.  While not an associate of any gang at the outset, Mr. DaSilva befriended codefendant Edson DaSilva and eventually participated in the criminal conduct charged in counts one and two of the Superseding Indictment.  *See id*; ECF No. 89.

As discussed further below, Mr. DaSilva's role in these offenses, while without excuse, is distinguished by, in turn, a comparative effort to restrain others, lack of complete knowledge of the gang's full intentions, and contemporaneous regret.  *See* PSR ¶¶37, 57; Evaluation at 4-6.  Mr. DaSilva's participation in the group was also fairly fleeting, with his principal involvement occurring over from January to March 2019.  *See* PSR ¶¶36-38, 45, 47, 51-52, 54-57.  Before his instant arrest on April 25, 2019, Mr. DaSilva was already pushed out of the group's orbit and threatened by members who questioned his loyalty.  *See* ATF Report of Special Agent Christopher Scott ("ATF Report"), attached at Ex. C.  Among the defendants in this case, Mr. DaSilva is distinguished by the combination of his relatively late entry to the group, his history of disagreement with its members, his simultaneous remorse for his conduct, and his exit from the gang prior to his arrest.  For the reasons stated in this memorandum, the Court should sentence Mr. DaSilva to 60 months incarceration.

### *Sentencing Factors*

18 U.S.C. §3553(a) provides as follows:

The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this section.  The court, in

3

determining the particular sentence to be imposed, shall consider - (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed – (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for [the Sentencing Guidelines]; (5) any pertinent policy statements [by the Sentencing Commission]; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

### *Nature and Circumstances of the Offenses*

From January to March 2019, Mr. DaSilva engaged in unlawful activity for which he profoundly regrets his participation. To be sure, he was never a leader of PCM; the "boss" or "leader" of the local gang was codefendant Marcio Costa ("Costa"). *See* PSR ¶¶16, 26; *see also* ECF No. 4-1 at ¶4. Nor was Mr. DaSilva among the more longstanding members of the group. Rather, both Mr. DaSilva and his friend Edson DaSilva "were not members of PCM" at the time of the "formation of PCM gang" in July 2018. See PSR ¶28. As Mr. DaSilva spent more time socializing with group members, however, he began to realize their gang-affiliation; in early 2019, after first driving around members of the group, he participated in several crimes suggested or initiated by his codefendants. *See* Evaluation at 4.

During his interviews with Dr. Carla Lourenco, Mr. DaSilva candidly acknowledged that "the robberies weren't right" and "could've seriously hurt someone;" fortunately, of course, no one was physically hurt. *See id*. Dr. Lourenco described Mr. DaSilva during the interviews as primarily "solemn," and always "calm and composed" during the meetings. *See* Evaluation at 3. Meeting with Mr. DaSilva on three different occasions, Dr. Lourenco — a forensic psychologist and experienced court clinician — found that Mr. DaSilva "expressed remorse for his criminal conduct." *See id* at 5; *see also* Lourenco CV; PSR ¶138.

Mr. DaSilva's insight into his personal behavior is reflected in the case itself. For example, Mr. DaSilva expressed near immediate regret for his role in the February 7, 2019 kidnapping of his girlfriend's friend; indeed, Mr. DaSilva abandoned the crime while it was still being committed by others. *See* PSR ¶57. According to a cooperating witness, Mr. DaSilva left the scene during the crime's commission and "expressed regret as to their actions with the victim." *See id.* Similar to the cooperating witness, who "had not known about [the kidnapping] beforehand," Mr. DaSilva was unclear about the extent of the codefendants' full intentions regarding the victim. *See* PSR ¶56; Evaluation at 4. Indeed, Mr. DaSilva's girlfriend was the victim's friend, and Mr. DaSilva had socialized with the victim on previous occasions. *See id.* While group members believed that the victim knew the address of an individual who participated in a shooting at PCM members, Mr. DaSilva was genuinely stunned and upset at the length codefendants were willing to take matters with the victim to learn this information. *See* PSR ¶57; Evaluation at 4-6. As Mr. DaSilva told Dr. Lourenco, "the kidnapping shocked [him] because of the way it happened," making him feel "very anguished" and prompting him to leave the scene entirely with the cooperating witness. *See* Evaluation at 5; PSR ¶56-57.

The limits of Mr. DaSilva's commitment to PCM, and his distress at some of its activities, was not limited to the kidnapping. For instance, Mr. DaSilva sought to be the sole moderating influence during the conspiracy to rob a fictional drug dealer set established by other PCM members with an undercover agent ("UC"). *See* PSR ¶37. It was codefendant Joao Pedro Marques Gama ("Gama") who initiated, developed, and showed most enthusiasm for the conspiracy, s*ee* PSR ¶¶30-40, though even Gama referred to his "boss" (Costa) in conversations with the UC. *See* PSR ¶34. For his part, Mr. DaSilva was treated as a subordinate in the fictitious robbery plan. *See* PSR ¶¶37. During a recorded meeting with the UC at a hotel on

March 20, 2019, codefendant Costa asked the UC if he minded if the fictitious drug courier was killed during the robbery, with the UC indicating that he did not. *See id.* Listening to this conversation among the others, Mr. DaSilva instantly thought it was a bad idea, and specifically told the others that none of fictional drug couriers should be killed. *See id.* Senior member Costa overruled him. *See id.* Fortunately, given the fictitious nature of the robbery, Gama and Costa's vision for the event was never consummated, and Mr. DaSilva's lack of dedication to PCM's activities had nearly spent its course in any event.

Just weeks after this meeting at the hotel, Mr. DaSilva had a "falling out" with PCM, with local members even "want[ing] to assault or kill" him. *See* ATF Report ¶1. Mr. DaSilva, still only twenty years-old and ready to pursue interests outside of the gang, had recently made romantic advances toward Costa's ex-girlfriend. *See id.* Local PCM members, who "were loyal to [Costa]," immediately turned on Mr. DaSilva and threatened to murder him. *See id.* Thus, by the time of his arrest on April 25, 2019, Mr. DaSilva had not only demonstrated on several occasions his belief that PCM acted excessively and showed remorse for his role, but he had been rejected from the group and, indeed, made its next target. *See id.*; PSR ¶¶57, 138; Evaluation at 4-6. While serendipitous in terms of timing, it was not the government who ended Mr. DaSilva's participation in the group by virtue of his arrest; it was Mr. DaSilva himself.

### *Mr. DaSilva's Personal History and Characteristics*

With his father murdered when he was just two years-old, his mother absent for much of his childhood, physical abuse at home, bullying at school by peers, and chronic struggles making financial ends meet, young Mr. DaSilva experienced an exceptionally challenging childhood. *See* PSR ¶116; Evaluation at 2, 5. When his mother wrested him from his older brother to come the U.S., seventeen year-old Mr. DaSilva lacked the friendship in his new country that he had

6

previously found in his older brother's company. *See* Evaluation at 2. In codefendant Edson DaSilva, Mr. DaSilva would find someone who "filled the void left by his brother who remained in Brazil." *See id*. Always a hard worker at construction sites, an autobody shop, and landscaping jobs, *see* PSR ¶136-137, Mr. DaSilva was also "driven by a desire to maintain his social network consisting of peers of a similar age, background, and language." *See* Evaluation at 6. After a lifetime of loss and abandonment, a young Mr. DaSilva found value in others who simply "wanted to hang out with us" by virtue of the group's identity and reputation. *See id*. at 4.

Citing the work of Dr. Thomas Grisso and Dr. Robert G. Schwartz, Dr. Lourenco suggests that Mr. DaSilva's "childhood trauma increased his vulnerability to forming an attachment to a delinquent peer group and succumbing to pressures to participate in their criminal activities. His young age at the time of the index crimes is also noteworthy, likely compounding those vulnerabilities." *See id.*, citing Grisso, T., & Schwartz, R. (eds.). (2000). *Youth on trial: A developmental perspective on juvenile justice*. Chicago: University of Chicago Press. Dr. Lourenco's assessment of Mr. DaSilva indeed appears to be the case. And yet, despite his desire to find belonging in his new environment, Mr. DaSilva nonetheless sought to temper the excesses of his peers, expressed contemporaneous remorse for his actions, and envisioned a future without the gang, despite the clear risks posed by leaving it. *See* PSR ¶37, 57; Evaluation at 5-6; ATF Report. With Mr. DaSilva's growing capacity for self-reflection, his future as a contributing and law-abiding member of society appears it can be fully realized.

### *Determining the Total Offense Level Under the Advisory Sentencing Guidelines*

As stated in Mr. DaSilva's Plea Agreement with the government, Mr. DaSilva's Total Offense Level ("TOL") is 31. See ECF No. 286 ("Plea Agreement") at ¶3. He has zero criminal

history points, thereby establishing a Criminal History Category ("CHC") of I.  *See* PSR ¶¶106-109. According to the sentencing table in USSG Chapter 5, Part A, a TOL of 31 combined with a CHC of I leads to a Guidelines Sentencing Range ("GSR") of 108-135 months in prison under the advisory sentencing guidelines.[1]

Both Mr. DaSilva and the government object to the PSR's calculation of a TOL of 33. *See* PSR Objection #1 by the Government; *see also* PSR Objections #2-7 by Mr. DaSilva. Specifically, the PSR incorrectly characterizes firearms as having been "otherwise used" as opposed to "brandished" in the January 14, 2019 robbery in Framingham and the January 16, 2019 robbery in Stoughton, resulting in an unwarranted increase of 6 levels rather than 5 levels to Mr. DaSilva's TOL.  See PSR ¶¶82, 87; *see also* 2B3.1(b)(2)(B) and (C).  As the government agreed in the plea agreement, while firearms were "brandished" in Framingham and Stoughton, they were not "otherwise used."  See Plea Agreement at ¶3(e).  Indeed, the government's determination that the firearms were "brandished" rather than "otherwise used" is a feature of several other plea agreements in this case.  *See e*.g. ECF No. 184 ("Edson DaSilva Plea Agreement") at ¶3(e) (Framingham); ECF No. 197 ("Igor Costa Plea Agreement") at ¶3(d) (Stoughton).

The Sentencing Guidelines define the relevant terms as follows:

> "Brandished" . . . means that all or part of the weapon was displayed, or the presence of the weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person. Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

> "Otherwise used" . . . means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.  *See* U.S.S.G. § 1B1.1, cmt. 1(C), (J).

---

[1] For reasons stated below, Mr. DaSilva requests a downward variance from the advisory guidelines.  The instant section, however, concerns the determination of the TOL in the first instance.

8

Here, while PSR ¶¶45 and 47 demonstrate that weapons were "brandished," i.e., "that all or part of the weapon was displayed . . . in order to intimidate that person," they do not establish that the weapon was "otherwise used."  *See e.g. United States v. LaFortune*, 192 F.3d 157, 161 (1st Cir. 1999) ("As we view it, a person may 'brandish' a weapon to 'advise' those concerned that he possesses the general ability to do violence, and that violence is imminently and immediately available. A general, or even pompous, showing of weapons, involving what one would consider an arrogant demonstration of their presence, constitutes the generalized warning that these weapons may be, in the future, used and not merely brandished.").

Probation's invocation of the "otherwise used" provision of the Sentencing Guidelines is not only incorrect, but prejudices Mr. DaSilva because it leads directly to the "Multiple Count Adjustment" contained at ¶96 of the PSR.  As the government and Mr. DaSilva acknowledge in the plea agreement, the "Multiple Account Adjustment" provisions of the guidelines are inapplicable to this case.  *See* Plea Agreement at ¶3(h) ("Group One is the highest group and counts as one unit, and the other groups do not score because they are more than eight levels less serious, totaling one unit, which results in no additional offense levels to the highest level of 34."); *see also* U.S.S.G § 3D1.4(c) ("Disregard any Group that is 9 or more levels less serious than the Group with the highest offense level.").  Probation's incorrect application of the "otherwise used" provision would result in an adjusted offense level of 26 rather than 25 levels for the robberies, unduly shrinking the differential between the highest (34 levels) and next-highest groups (26 levels) to eight-levels.  Through its erroneous analysis, Probation threatens to unravel the considered judgment of the parties in several cases and cause an unjustified upward "multiple account adjustment" of two-levels that the parties themselves have rejected.  *See* PSR ¶¶96-99.

This Court should reject probation's calculation and find a five-level adjustment for the brandishing of the firearm. As indicated in the plea agreement, Mr. DaSilva's TOL is 31. When combined with a CHC of I, Mr. DaSilva's advisory GSR is 108 to 135 months.

### *The Totality of the Circumstances Require a Downward Variance from the Advisory Sentencing Guidelines to a Sentence of Sixty Months in Prison*

In the totality of the circumstances, imposition of an advisory sentencing guidelines sentence would excessively punish twenty-two year old Mr. DaSilva, even at the low end recommended by the government. First, as the government, defense, and probation all agree, the offense that most directly "controls" the guidelines calculation in this case is the February 7, 2019 kidnapping of the friend of Mr. DaSilva's girlfriend. *See* PSR ¶¶91-95; *see also* Plea Agreement at ¶3(c), (f), and (g). All three parties agree that the offense level for that incident is 34, which, from the perspective of the government and defense, is 9 levels higher than the next serious group. And yet, Mr. DaSilva hardly played a typical role in the kidnapping incident. To the contrary, he was genuinely "shocked" and "very anguished" at how that incident developed, and abandoned that offense as it was occurring. *See* Evaluation at 5; PSR ¶57. Even according to a cooperating witness, Mr. DaSilva "expressed regret as to their actions with the victim" contemporaneous to the event as he left the scene. *See* PSR ¶57; *see also* Evaluation at 5. Mr. DaSilva's conduct, therefore, stands in stark contrast to the behavior of his codefendants, including Edson DaSilva, who persisted in the kidnapping even after Mr. DaSilva left. *See* PSR ¶¶57-59.

A non-guidelines sentence is authorized under *United States v. Booker*, 543 U.S. 220 (2005) based on §3553(a) factors even for grounds that did not support departure. *See e.g.*, *U.S. v. Jenkins*, 537 F.3d 1, 13 (1sr. Cir. 2008) (Although District Court denied departure for overstated criminal history, it varied "five years below the bottom of the Guidelines range" given

10

the overall circumstances presented).  While Mr. DaSilva accepts full responsibility for his role in the incident, his lack of full knowledge as to his codefendants' intentions, his abandonment of the crime mid-incident, and his contemporaneously expressed remorse, collectively render the incident outside the "heartland" to which the Sentencing Commission intends individual guidelines to apply.  *See Rita v. United States*, 551 U.S. 338, 344 (2007).  Where this offense sets the benchmark for the advisory guidelines so definitively in this case, and Mr. DaSilva's role was so distinct within it, it would be unjust to sentence Mr. DaSilva for the incident in the same fashion as his codefendants.  This Court should vary downward based on Mr. DaSilva's demonstrably lesser role in the incident.

Similarly, Mr. DaSilva's effort to moderate his codefendants during the discussion of the fictitious robbery with the UC, his eventual expulsion from the gang for insufficient loyalty, and his clearly expressed contrition for his participation, all weigh strongly in favor of a downward variance.  *See* PSR ¶¶37, 138; Agent Report; *see also Gall v. United States*, 552 U.S. 38  (2007) (post-offense self-rehabilitation supported sentence of probation); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008).

Further, the present case is Mr. DaSilva's first and only criminal conviction, and "a prison term would mean more to [Mr. DaSilva] then to a defendant who previously had been prisoned."  *See United States v. Baker*, 445 F.3d 987, 993 (7th Cir. 2006).

Moreover, the consequences of Mr. DaSilva's nearly inevitable deportation to Brazil mitigates against an advisory guidelines sentence.  *See Jordan v. De George*, 341 U.S. 223, 232 (1951) (deportation is "a life sentence of banishment in addition to the punishment which a citizen would suffer from the identical acts").  Further, undocumented aliens like Mr. DaSilva face more severe restrictions in prison than non-aliens.  *See e.g. United States v. Navarro-Diaz*,

420 F.3d 581 (6th Cir. 2005) (illegal reentry case remanded in light of *Booker* where district court noted defendant would be punished more than a citizen due to ineligibility of six month halfway house at end of term).

A sentence of sixty months in prison, followed by deportation, is appropriate and "not greater than necessary" to achieve the purposes of 18 U.S.C. §3553(a).  Mr. DaSilva's efforts to curb the excesses of the group, shock at its conduct, abandonment of its purposes, and clearly demonstrated remorse all support a still substantial sentence of five years in prison. Twenty-two year-old Mr. DaSilva, who has already experienced significant personal loss, would be appropriately punished by the requested sentence.  The Court should impose it.

## *Conclusion*

For the reasons stated herein, Mr. DaSilva respectfully requests the Court sentence him to sixty months of incarceration.

> Respectfully Submitted,
> BRENO HENRIQUE DASILVA
> By his attorney:
>
> */s/ David J. Grimaldi*
> David J. Grimaldi
> David J. Grimaldi, P.C.
> BBO No. 669343
> 929 Massachusetts Avenue, Suite 200
> Cambridge, MA 02139
> 617-661-1529 (tel)
> 857-362-7889 (fax)
> david@attorneygrimaldi.com

DATE: January 29, 2021

## CERTIFICATE OF SERVICE

I, David J. Grimaldi, hereby certify that true copies of this memorandum were served on all registered participants this 29th day of January, 2021.

> */s/ David J. Grimaldi*
> David J. Grimaldi